UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/29/2026
```

RICHARD ROSATO,

                                    Plaintiff,

        -against-

CITY OF YONKERS,

                                    Defendant.

No. 24-CV-3183 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff Richard Rosato ("Plaintiff") brings this action pursuant to the Americans with Disabilities Act ("ADA"), alleging that Defendant, the City of Yonkers (the "City" or "Defendant"), failed to provide him with reasonable accommodation and, as a result, retaliated against him for requesting such accommodation.  Presently before the Court is the City's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (ECF No. 31.)

For the following reasons, the City's motion is GRANTED.

## FACTUAL BACKGROUND

Plaintiff and Defendant submitted briefs, statements of material facts pursuant to Local Rule 56.1, responses to the opposing statements of material facts, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background.

### I.    Plaintiff's Employment with the Department of Public Works

Defendant, the City of Yonkers, is a municipal corporation.  (ECF No. 32, "Def. Mot." at 4.)  The City is comprised of various departments, including the Department of Public Works ("DPW").  (*Id*.)  DPW is divided into several divisions and bureaus, including General Services,

1

Snow and Ice Control, Refuse and Recycling Collection (also known as "Sanitation"), Refuse and Recycling Disposal, City Maintenance, the Water Bureau, and the Sewer Bureau. (*Id*. at 4–5.)

Plaintiff Richard Rosato began employment with the City in November 1996. (ECF No. 38, "Pl. Counter 56.1," ¶ 1.) Plaintiff was employed as an Environmental Maintenance Worker ("EMW"). (ECF No. 34, "Def. 56.1," ¶ 1.) An EMW is tasked with, *inter alia*, manually lifting refuse containers, loading refuse onto trucks, and returning containers to locations where they were placed for collection. (Def. Ex. H at 1.) An EMW is also tasked with transporting and disposing of refuse, and maintaining the vehicle used to do so. (*Id*.) For most of his employment with the City, Plaintiff was assigned to the Sanitation Bureau. (Def. 56.1 ¶ 11.) Sanitation duties encompass manually lifting refuse. (*Id*.) Plaintiff has been primarily tasked with "the manual collection of garbage… [an] assignment he has had for the last two decades." (Pl. Counter 56.1 ¶ 1.)

## II.    Plaintiff's Medical Condition and Requested ADA Accommodation

On September 30, 2019, Plaintiff was injured in a work-related accident that severely injured his knees. (Pl. Ex. 1 at 2.) Starting in November 2022, Plaintiff required double knee replacement surgeries, leaving him "incapable of working as a sanitation man." (ECF No. 36, "Pl. Opp.," at 17.) The City thereby sought to terminate and suspend Plaintiff without pay by means of a New York State Civil Service Law ("CSL") § 75 proceeding on November 15, 2022. (Pl. Counter 56.1 ¶ 2.) As a result of the proceeding, on July 26, 2023, an AAA-appointed arbitrator ordered that Plaintiff be reinstated as an EMW with no backpay. (*Id*. ¶ 4.) The City complied. (*Id*. ¶ 5.)

Following Plaintiff's reinstatement, the City scheduled a medical examination for him on August 4, 2023. (*Id*. ¶ 9.) Dr. Julia Kaci, who conducted the examination, concluded that Plaintiff

was "not fit to work as an environmental maintenance worker without limitations due to chronic left knee pain." (Pl. Ex. 1 at 5.) Plaintiff similarly underwent an independent medical examination to assess whether he was physically able to perform the duties of an EMW. (Def. 56.1 ¶ 7.) On or about August 10, 2023, Dr. Steven Zelicof—Plaintiff's physician—submitted a note to the City explaining that Plaintiff was "able to return to work but is unable to perform the duties associated with the sanitation department." (Pl. Ex. 9.) Dr. Zelicof also wrote, however, that Plaintiff "may work in any other department for the City of Yonkers." (*Id*.) The City's Human Resources ("HR") Department subsequently sent Plaintiff an ADA accommodation request form for his physician to complete. (Def. Ex. N.)

Between August and October 2023, the parties engaged in a series of written communications concerning Plaintiff's request for reasonable accommodation. (Def. 56.1 ¶ 7.) On or about August 17, 2023, the City submitted a letter to Plaintiff stating that he was on a leave of absence pursuant to CSL § 71. (Def. Ex. Y.) Dr. Zelicof subsequently submitted three ADA accommodation request forms on behalf of Plaintiff, dated (1) August 17, 2023, (2) August 24, 2023, and (3) August 29, 2023. (Def. Exs. O, Q, R.) Each ADA accommodation request form prescribed the same "Restrictions or Limitations"—"No Sanitation duties (No jumping, No running)." (Def. Exs. O, Q, R.) Dr. Zelicof similarly submitted several letters to the City concerning Plaintiff's ability to perform the EMW job duties. For instance, Dr. Zelicof submitted a letter on September 5, 2023 noting that Plaintiff "is perfectly capable of fulfilling and performing the functions and duties of an EMW even with his slight limitations with running and jumping." (Pl. Ex. 15.) However, on October 2, 2023, Dr. Zelicof submitted a letter stating that Plaintiff can return to "his sanitation route if his duties involve mostly driving." (Pl. Ex. 22.) Dr. Zelicof also submitted a letter stating that Plaintiff "is unable to repetitively manually lift refuse." (Pl. Ex. 23.)

3

The City eventually responded and denied Plaintiff's requests for reasonable accommodation on October 17, 2023, citing that such requests conflict with the essential functions of an EMW.  (Def. Ex. X.)

### III.    Plaintiff's Attempt at Transferring to the Sewers Bureau

On November 2, 2023, Plaintiff submitted a transfer request for a "Street Sweeper" position in the Sewer Bureau—a position within the DPW but outside of the Sanitation Bureau.  (Pl. Counter 56.1 ¶ 26.)  There does not appear to be a specific job description for this position.  However, certain employees who hold the EMW job title within the Sewer Bureau are assigned to drive a street sweeper.  (Def. Ex. DD at 1.)  Nonetheless, street sweeping appears to be one of the various job functions held by an EMW.  (Pl. Ex. 6 at 1.)

Around the time Plaintiff submitted his transfer request, the City assigned six EMWs to street sweeper positions.  (Def. 56.1 ¶ 15.)  Such positions were both available and provided to other employees in the Sewer Bureau in need of accommodation.  (Pl. Counter 56.1 ¶ 27.)  For instance, another EMW from the Sanitation Bureau was transferred into the Sewer Bureau on October 30, 2023.  (Pl. Ex. 27.)  Between 2023 and 2024, the City transferred several EMWs to the Sewer Bureau.  (Pl. Ex. 32, Tr. 42:12–44:2.)  Two of these vacancies were filled by transfers from the Sanitation Bureau, and another was filled by a transfer from the Parks Department.  (*Id*. Tr. 43: 8–12.)  The City, however, denied—or never responded to—Plaintiff's requested transfer.  (Pl. Counter 56.1 ¶ 28.)  Thomas Meier, the Commissioner of the DPW, testified that Plaintiff was not transferred because "his doctor has said he's not qualified to be an environmental maintenance worker" and that "all EMWs have to perform the same function."  (Pl. Ex. 30, Tr. 14:20–15:3)

Shortly thereafter, Carlos Moran, the Commissioner of the City's HR Department, scheduled a fitness for duty examination for Plaintiff.  (Pl. Counter 56.1 ¶ 81.)  Dr. Douglas

4

Schwartz, who conducted the examination, reported that Plaintiff was unable to perform the duties of an EMW without limitation. (Def. Ex. C, Tr. 84–85.) His report ultimately concluded that Plaintiff was "[t]otally disabled from usual work as [an] Environmental Maintenance Worker." (*Id*. Tr. 85: 4–10.) According to Plaintiff, however, Dr. Schwartz was not asked whether Plaintiff could be reasonably accommodated. (Pl. Counter 56.1 ¶ 84.) Nor was Dr. Schwartz informed about the range of positions held by employees with the EMW job title. (*Id*. ¶ 85.)

Given that Plaintiff was not transferred to the Sewer Bureau, the City ultimately maintained him on unpaid leave since November 2022 and terminated his insurance coverage sometime in the spring of 2023. (*Id*. ¶ 30.) Plaintiff subsequently applied for Social Security Disability Insurance ("SSDI") benefits and was awarded those benefits by the Social Security Administration commencing in January 2023. (Def. 56.1 ¶ 17.) Plaintiff eventually filed for retirement with the New York State Pension System, which became effective on October 27, 2024. (*Id*. ¶ 14.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on April 26, 2024. (ECF No. 1.) On July 22, 2025, Defendant moved for summary judgment and submitted a memorandum of law in support and Rule 56.1 statement of undisputed material facts. (ECF Nos. 31–34.) Plaintiff opposed the motion and submitted a counterstatement to Defendant's Rule 56.1 statement of undisputed material facts. (ECF Nos. 36–38.) Defendant filed a reply memorandum in further support of its motion. (ECF No. 39.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, inclusive

of deposition testimony, documents, affidavits, and declarations, *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing… that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus then shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must "draw all rational inferences in the non-movant's favor" while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (noting that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment"). Rather, in answering the primary inquiry of "whether there is the need for a trial," the court must determine "whether a fair-minded jury *could* return a verdict for the plaintiff [or non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 250, 252. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## DISCUSSION

The City moves for summary judgment on several grounds: (1) Plaintiff is not a qualified individual under the ADA as his receipt of SSDI benefits is inconsistent with his reasonable accommodation claim; (2) Plaintiff cannot establish a failure-to-accommodate claim under the ADA because he cannot perform an essential function of the EMW position; (3) Plaintiff cannot establish a reassignment claim under the ADA because reassignment would have been an unreasonable accommodation; and (4) Plaintiff cannot establish a retaliation claim under the ADA because he cannot demonstrate an adverse employment action or a causal connection.  (*See generally* Def. Mot.)  The Court addresses each claim in turn.

## I.    ADA Accommodation Claim

### a.   Estoppel

The City asserts that summary judgment is warranted because Plaintiff is not a qualified individual under the ADA and is, in effect, estopped from pursuing an ADA claim, arguing that his receipt of SSDI benefits is inconsistent with his assertion that he could perform the essential functions of his position with reasonable accommodation.  (Def. Mot. at 16.)

In support, the City primarily relies on the Supreme Court's decision in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999).  There, the Court held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." 526 U.S. at 797–98.  The Court also held that "the law erect[s] a strong presumption against the recipient's success under the ADA."  *Id*.  To survive summary judgment, however, the Court concluded that if there are inconsistencies between an ADA plaintiff's SSDI benefits submissions and concurrent reasonable accommodation claims, the plaintiff must provide a sufficient explanation reconciling those representations with the assertion that he can perform the essential functions of the job, at least with reasonable accommodation.  *Id.* at 798.  Considering *Cleveland*,

the Second Circuit has held that "[w]hen an individual's prior submission regarding his disability to an adjudicatory body contains a purely factual statement that directly contradicts a statement made in a subsequent [disability discrimination] claim, and the two cannot be reconciled with any amount of explanation, judicial estoppel will preclude" that claim. *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 119 (2d Cir. 2004) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 333 (2d Cir. 2000)). Indeed, when faced with a plaintiff's previous sworn statement asserting "total disability" as is the case here, "the court should require an explanation of any apparent inconsistency with the necessary elements of a [disability discrimination] claim." *Abdelsayed v. New York Univ.*, 2023 WL 4705999, at *8 (S.D.N.Y. July 24, 2023), *aff'd*, 2024 WL 2828414 (2d Cir. June 4, 2024).

With that background, the Court first examines Plaintiff's submissions to the Social Security Administration in connection with his SSDI benefits application. There, Plaintiff wrote that he stopped working as an EMW on July 18, 2022, and was unable to work "[b]ecause of his condition." (Def. Ex. BB at 26.) The Social Security Administration subsequently approved Plaintiff's SSDI benefits application on May 26, 2023, determining that he was "[d]isabled." (*Id*. at 33.) Plaintiff thereby began receiving SSDI benefits on or around May 27, 2023, which was about three months before Plaintiff submitted his request for reasonable accommodation. (*Id*.; Def. Ex. O.) The Court next examines the representations made by Plaintiff and his physician, Dr. Zelicof, to the City concerning Plaintiff's ability to work as an EMW. Those representations include statements that Plaintiff "may work in any other department for the City of Yonkers" (Def. Ex. M); may work "any job but sanitation" (Def. Ex. O); that the "patient is able to do all jobs except sanitation due to medical condition" (Def. Ex. O); and that Plaintiff "is also unable to repetitively manually lift refuse" (Def. Ex. W). The City argues that these representations are

8

inconsistent with Plaintiff's position that he is disabled and unable to work, as acknowledged by both Plaintiff and the Social Security Administration. (Def. Ex. BB at 26, 33.)

In response, Plaintiff offers two explanations to reconcile the alleged inconsistencies: (1) he was placed on unpaid leave in November 2022 due to requiring double knee replacement surgeries; and (2) he could have continued working as an EMW had his accommodation requests been granted. (Pl. Opp. 17.) Although the Court concludes, as explained in more detail below, that Plaintiff fails to provide sufficient evidence demonstrating whether he can perform the essential functions of an EMW, the Court nevertheless rejects the City's argument that Plaintiff's ADA claims are estopped based on his receipt of SSDI benefits. It is undisputed that Plaintiff was placed on unpaid leave starting in November 2022 when the City sought to terminate him. (Rosato Decl. ¶ 2.) It is also undisputed that the City denied Plaintiff's accommodation request to be transferred from the Sanitation Bureau to the Sewer Bureau. (*Id*. ¶ 6.) As a result, Plaintiff applied for SSDI benefits and continued to receive such benefits. Indeed, Plaintiff's "description of himself as 'completely incapacitated—disabled' referred to [the defendant's] explanation for [attempting to] terminat[e] him and not to whether he was capable of performing the essential functions of the job with reasonable accommodation." *Parker*, 204 F.3d at 335.

As a matter of law, at least for the purpose of an estoppel analysis, the Court concludes that Plaintiff's explanation that he could have continued working as an EMW had his accommodation been granted does not preclude him from asserting an ADA claim again the City. *See Rodal*, 369 F.3d at 119 ("But, as he stated… with no such accommodation having been granted… he could no longer carry out the duties of that position and, thus, found it necessary to take disability leave."); *Abdelsayed*, 2023 WL 4705999, at *9, 12 (despite finding that plaintiff was unqualified to perform the essential functions of his job due to his disability, plaintiff's explanation—that he could have

continued to perform his job with the proposed accommodations—was sufficient to defeat defendant's estoppel claim based on the plaintiff's receipt of SSDI benefits).

### b. Qualified to Perform Essential Job Functions

The City next asserts that summary judgment is warranted because Plaintiff, as acknowledged by the several letters and forms submitted by his physician, is unable to perform the essential job functions required of an EMW. (Def. Mot. at 10–11.) Under the ADA, an employer must "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). This requirement, however, only applies to a "qualified individual" under the ADA. *Id*. § 12111(8). The term "qualified individual" means an individual who, with or without reasonable accommodation, can "perform the essential functions of the employment position that such individual holds or desires." *Id*.

Against this statutory backdrop, to establish *a prima facie* case for failure to provide a reasonable accommodation, a plaintiff must show that (1) he is a person with a disability within the meaning of the statute; (2) the employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the position at issue; and (4) the employer refused to provide such accommodation. *Williams v. Geiger*, 447 F. Supp. 3d 68, 79–80 (S.D.N.Y. 2020) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)). The plaintiff bears the burden of demonstrating that a proposed accommodation exists and permits them to "perform the job's essential functions." *Schneider v. Wal-Mart Stores, Inc.*, 2019 WL 294309, at *6 (S.D.N.Y. Jan. 23, 2019) (citing *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)). Once that burden is satisfied, it shifts to the defendant to demonstrate that the proposed accommodation is unreasonable. *Id*. A reasonable accommodation under the ADA

10

includes, but is not limited to, "job restructuring, part-time or modified work schedules, reassignment to a vacant position… and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).  Where a plaintiff proposes reassignment to a vacant position as reasonable accommodation, the plaintiff bears the burden of demonstrating qualification for that position.  *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009).  The determination of what constitutes a reasonable accommodation is nevertheless a "highly fact-specific… case-by-case inquiry." *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 165 (2d Cir. 2013) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996)).

The crux of this action is whether Plaintiff required reasonable accommodation to perform the essential functions of his job and whether the City failed to provide such accommodation.  The ADA does not define the term "essential function."  Nonetheless, regulations promulgated by the U.S. Equal Employment Opportunity Commission provide that an essential function "encompasses 'the fundamental job duties of the employment position.'" *McBride*, 583 F.3d at 98 (quoting 29 C.F.R. § 1630.2(n)(1)).  In defining an essential function, the Second Circuit has also granted "considerable deference to an employer's determination as to what functions are essential." *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013).  At the same time, the meaning of that phrase in any individual case "depends on the totality of the circumstances," *Rodal*, 369 F.3d at 120, and requires a "fact intensive" analysis, *Lavender v. Verizon New York Inc.*, 2023 WL 1863245, at *16 (E.D.N.Y. Feb. 9, 2023) (citing *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 127 (E.D.N.Y. 2014)).  The relevant factors to consider generally include the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of

11

current employees in similar positions.  *See Stone v. City of Mt. Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(2)).

The City asserts that Plaintiff is unable to perform the essential functions of an EMW regardless of being granted accommodation.  (Def. Mot. at 13.)  Plaintiff responds that, with proper accommodation, he can perform other positions under the EMW umbrella—such as a Street Sweeper.  (Pl. Opp. at 15–16.)  As both parties have acknowledged, there is no separate job title for a Street Sweeper, as it is encompassed within the EMW position.  (Def. Ex. H; Pl. Ex. 6.)  The job description for an EMW, however, consists of several duties.  (Pl. Ex. 6 at 1.)  The very first sentence of the EMW job description states that the "position is responsible for operating motorized vehicles, equipment, and machinery, as well as performing the collection and disposal of refuse, and the maintenance and cleaning of public facilities."  (*Id.*)  Along similar lines, the first bullet point of the EMW job description states that someone in this position must "[o]perate a vehicle used in the transportation, collection and disposal of solid waste, refuse and debris or the transportation of equipment and supplies."  (*Id.*)  The EMW job description goes on to list several other duties, including manually lifting refuse containers, loading refuse onto trucks, and returning containers to the locations where they were placed for collection.  (*Id.*)

It is apparent that the EMW position requires the performance of numerous physically demanding duties.  Plaintiff, however, points out that one of the EMW job duties is to "[s]weep[] city streets."  (Pl. Ex. 6 at 1.)  Essential functions are nonetheless "fundamental duties" to be performed in the position in question, as opposed to "functions that are merely marginal."  *Pagan v. CSC*, 2018 WL 3242268, at *5 (S.D.N.Y. July 3, 2018) (citing *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)).  As noted above, the Court "must give considerable deference to an employer's judgment regarding what functions are essential for service in a

12

particular position." *Farina v. Cnty. of Orange*, 2018 WL 10704514, at *8 (S.D.N.Y. June 27, 2018) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998); *Stevens v. Rite Aid Corporation*, 851 F.3d 224, 229 (2d Cir. 2017)). To this end, the City provides ample evidence demonstrating that one of the essential functions of an EMW consists of manually lifting refuse. For instance, the City submits an affidavit from DPW Commissioner Meier, who states that manually lifting refuse is an essential function of the EMW title. (*See* Def. Ex. CC ¶ 6.) Kenneth Greehan, Manager of the Sewer Bureau, also testified that all EMWs are expected to be able to perform any of the job title's functions. (Def. Ex. E., Tr. 44:3:19.) These explanations align with the first paragraph of the EMW job description. (Pl. Ex. 6 at 1.)

In turn, Plaintiff raises several arguments in response to the City's evidence. Plaintiff first argues that other EMW positions exist that do not require running or jumping onto a sanitation truck or manually lifting refuse. (Pl. Opp. at 15.) Plaintiff seeks such a position because, as his physician notes, Plaintiff cannot perform "[s]anitation duties," (Def. Exs. O, Q, R), and "is unable to repetitively manually lift refuse," (Pl. Ex. 23). As already discussed, the EMW job description includes a variety of physically demanding duties, including manually lifting refuse containers. (Pl. Ex. 6 at 1.) According to Plaintiff, a Street Sweeper only drives a sweeper. (Pl. Counter 56.1 ¶ 26.) Plaintiff, however, fails to provide any evidence demonstrating that EMWs assigned to street sweeping roles solely ride a street sweeper and do not perform any of the other twelve listed duties of the EMW position. (Pl. Ex. 6 at 1.) In fact, the bullet point in the EMW job description that includes street sweeping also includes manual labor consisting of "remov[al] of snow from streets, roadways, and other public areas, via… shovels." (*Id*.) And while Plaintiff claims that

13

other EMWs "work as street sweepers, driving machines around sweeping the curbs," his cited evidence does not support his assertion.[1]

Plaintiff next argues that he submitted letters from his physician, Dr. Zelicof, noting that Plaintiff can perform many of the job positions within the EMW position. (Pl. Opp. at 15.)  Dr. Zelicof's letters nevertheless appear to be contradictory.  For instance, Dr. Zelicof submitted a letter on September 5, 2023, noting that Plaintiff "is perfectly capable of fulfilling and performing the functions and duties of an EMW even with his slight limitations with running and jumping." (Pl. Ex. 15.)  However, on October 2, 2023, Dr. Zelicof submitted a letter stating that Plaintiff can return to "his sanitation route if his duties involve mostly driving."  (Pl. Ex. 22.)  Dr. Zelicof also submitted a letter stating that Plaintiff "is unable to repetitively manually lift refuse."  (Pl. Ex. 23.) The Court again must acknowledge that the EMW position, based on the job description that both parties provided, appears to include several physically demanding tasks.  (Def. Ex. H; Pl. Ex. 6.) Indeed, the very first sentence of the EMW job description states that the "position is responsible for… performing the collection and disposal of refuse, and the maintenance and cleaning of public facilities."  (Pl. Ex. 6 at 1.)

Moreover, while Plaintiff insists that other EMWs were transferred from the Sanitation Bureau to the Sewer Bureau to become Street Sweepers, Plaintiff does not provide evidence that those employees did not perform physically demanding tasks.  (*See, e.g.*, Pl. Counter 56.1 ¶¶ 72–77.)  Instead, Plaintiff provides a transfer slip that merely shows one employee being transferred from the Sanitation Bureau to the Sewer Bureau.  (Pl. Ex. 27.)  Nowhere on the transfer slip does

---

[1] Plaintiff cites the deposition testimony of DPW Commissioner Meier to support the assertion that Street Sweepers only ride a machine and sweep streets.  (*See* Pl. Counter 56.1 ¶ 39; Pl. Ex. 30, Tr. 13:2–5).  However, when asked "[w]hat are street sweepers," the DPW Commissioner testified only that "[s]treet sweepers are large pieces of equipment that have brooms and vacuums, and they go around the city and sweep the curbs and the streets."  (Pl. Ex. 30, Tr. 29:25–30:5.)

it state what this employee's job duties would be once in the Sewer Bureau.  (*Id*.)  Plaintiff also, as referenced above, does not provide evidence demonstrating that a Street Sweeper is limited only to operating a vehicle.  On the contrary, the City provides evidence demonstrating that certain EMWs in the Sewer Bureau perform refuse collection daily.  (Def. Ex. I, Tr. 11:20–12:15.)  It follows that, even if Plaintiff were transferred to the Sewer Bureau, there would still be the possibility that he would be required, consistent with the EMW job description, to perform refuse collection.  (Pl. Ex. 6 at 1.)  While the Court acknowledges that Plaintiff at one point appeared to operate a street sweeper in the Sewer Bureau, (Pl. Ex. 32, Tr. 32:10–12), it is unclear on the present record whether he would not be tasked with performing the essential functions of an EMW, (Pl. Ex. 6 at 1).

While the Court is sympathetic to Plaintiff, the Court nevertheless concludes that he fails to provide evidence demonstrating that he can perform the duties of an EMW.  A reasonable accommodation "may include adjustments to work schedules or other job restructuring… [but] a reasonable accommodation can never involve the elimination of an essential function of a job." *Balchan v. New York City Hous. Auth.*, 2025 WL 588021, at \*7 (S.D.N.Y. Feb. 24, 2025) (quoting *McMillan*, 711 F.3d at 127).

### c.  Failure to Engage in Interactive Process

In a similar vein, the City argues that summary judgment is warranted because Plaintiff has failed to adduce evidence that the City refused to provide reasonable accommodation in the form of a transfer, including evidence that any breakdown in the interactive process resulted in the denial of such an accommodation.  (Def. Mot. 19.)

The ADA "envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *McBride*,

583 F.3d at 99 (citing *Jackan*, 205 F.3d 566). That process, however, is not itself a source of liability. As the Second Circuit explained, "the ADA imposes liability for, *inter alia*, discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible." *Id.* at 100. Accordingly, the Second Circuit has held that "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless [he] also establishes that, at least with the aid of some identified accommodation, [he] was qualified for the position at issue."[2] *Id.* at 101.

For similar reasons as stated above, the Court does not find that Plaintiff's proposed transfer to the Sewer Bureau was a reasonable accommodation because he fails to provide evidence that he can perform the essential job functions of an EMW. Plaintiff did not request to be transferred to a new position—he merely requested that he be transferred from the Sanitation Bureau to the Sewer Bureau while still holding the EMW job title. (Pl. Ex. 4.) Plaintiff cannot point to a single bullet point from the EMW job description and characterize it as a reasonable accommodation when he cannot perform several of the position's other essential duties—including those listed in the very first sentence of the job description, which requires "performing the collection and disposal of refuse." (Pl. Ex. 6 at 1.) While Plaintiff argues that another EMW was transferred from the Sanitation Bureau to the Sewer Bureau shortly before he submitted his own

---

[2] The Second Circuit is not alone in reaching this conclusion. *See, e.g.*, *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 864 (8th Cir. 2006) ("Under the ADA, if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process."); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (noting that refusal to engage in an interactive process does not give rise to liability under the ADA if "no reasonable accommodation was possible" and that "if it is clear that no reasonable accommodation was available, we stop there"); *Soto–Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 19 (1st Cir. 1998) ("plaintiff's assertion that [defendant employer] failed to engage in 'meaningful' interaction with plaintiff regarding reasonable accommodation is of no moment—or, more precisely, it puts the cart well before the horse—because no reasonable trier of fact could have found, on this record, that [a reasonable accommodation was possible.]").

transfer request, this fact does not demonstrate what specific job duties that employee would be performing.  (Def. Ex. I, Tr. 11:20–12:15.)

As a matter of law, the City was not required to engage in the interactive process where there is no evidence that the proposed accommodation was possible.  *Schneider*, 2019 WL 294309, at *8 (citing *McBride*, 583 F.3d at 100–01).  "An ADA plaintiff does not satisfy [his] burden to identify a potential accommodation merely by reciting the formula that [his] employer could have reassigned [him].  Instead, []he must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which []he could have been reassigned." *McBride*, 583 F.3d at 97–98 (citing *Jackan*, 205 F.3d at 566–67 (2d Cir. 2000)); *see also Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir.1999) ("[A]n employer need not reassign an employee if no position is vacant.  Nor is the employer obliged to create a new position to accommodate the employee.").

With that said, Plaintiff fails to demonstrate that such a vacancy even existed in the Sewer Bureau.  Plaintiff submitted a transfer request to the Sewer Bureau on November 2, 2023.  (Pl. Ex. 4.)  To demonstrate that positions in the Sewer Bureau were vacant, Plaintiff relies on a roster of employees assigned to the Sewer Bureau on January 2, 2023, and January 1, 2024.  (Pl. Ex. 25.)  That roster, however, does not indicate when any listed employees were transferred into the Sewer Bureau and therefore does not establish the existence of a vacant position at the time Plaintiff submitted his transfer request.  (*Id*.)  Plaintiff also points to a specific example of an EMW who was transferred from the Sanitation Bureau to the Sewer Bureau on October 30, 2023.  (Pl. Ex. 27.)  That transfer occurred three days before Plaintiff submitted his own transfer request and thus does not demonstrate that a position was available when Plaintiff sought a transfer.  (Pl. Ex. 4.)  Finally, although other employees were transferred into the Sewer Bureau, Plaintiff does not

provide evidence identifying whether those individuals, despite their alleged need for accommodation, were able to perform the essential functions of an EMW, or what their alleged disabilities were. To the contrary, the record only reflects that both the City and Plaintiff's physician agree that he can no longer perform an essential function of the EMW position, namely, manually lifting refuse. (*See, e.g.*, Pl. Exs. 1, 9, 15, 22–23; Def. Exs. O, Q, R.)

Consequently, in the absence of evidence demonstrating that Plaintiff can perform the essential job functions of an EMW, or that reasonable accommodation existed, the City is granted summary judgment with respect to Plaintiff's ADA reasonable accommodation claims.

## II.    ADA Retaliation Claim

The City finally asserts that summary judgment is warranted because Plaintiff has failed to establish a *prima facie* case of ADA retaliation. (Def. Mot. at 21.) Plaintiff contends that the City retaliated against him for requesting accommodation in the form of a transfer to the Sewer Bureau. (Pl. Opp. at 23–24.) Plaintiff identifies two actions as evidence of retaliation: (1) Defendant's August 17, 2023 letter threatening to terminate his employment, and (2) Defendant's denial of his requested accommodation.[3]  (*Id*.)

The burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973) applies to retaliation claims under the ADA. *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)). To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he participated in an activity protected by the ADA; (2) his participation was known to the defendant; (3) defendant subjected

---

[3] Plaintiff argues in his opposition papers that the City notified him "of its intent to terminate him [in September 2023] and then terminated him [in May 2024] from his title." (Pl. Opp. at 24.) Plaintiff does not identify the specific letter on which this claim is based. (*Id*.) Nor does Plaintiff cite to any portion of the record or to relevant legal authority in support of this argument. (*Id*. at 23–24.) Nevertheless, the Court assumes that Plaintiff is referring to Defendant's September 18, 2023 letter, which merely reiterates the contents of the City's August 17, 2023 letter. (*See* Pl. Exs. 12, 19.)

him to a material adverse action; and (4) a causal connection existed between the protected activity and the adverse action. *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)). "If a plaintiff makes out a *prima facie* case of discrimination, the defendant must produce evidence supporting an explanation for the [adverse action] which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Samuels v. Urb. Assembly Charter Sch. for Computer Sci.*, 2025 WL 1785847, at *5 (S.D.N.Y. June 26, 2025) (quoting *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 132 (E.D.N.Y. 2023)). If the employer proffers a legitimate, non-discriminatory reason for the adverse action, "the presumption of discrimination drops out of the picture, and the plaintiff bears the burden of demonstrating by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Cantres v. N.Y.P. Holdings, Inc.*, 2016 WL 5867046, at *4 (E.D.N.Y. Sept. 30, 2016). For purposes of this motion, the City does not dispute that Plaintiff satisfies the first and second elements of a *prima facie* retaliation claim. (Def. Mot. at 21.) The City instead argues that Plaintiff fails to establish the third and fourth elements, namely, that he suffered an adverse employment action and that there is a causal connection between the protected activity and the alleged adverse action. (*Id*. at 21–22.)

Plaintiff first asserts that the City's August 17, 2023 letter constituted an adverse employment action because it threatened to terminate his employment "pursuant to section 71 of New York State Civil Service Law if [he] did not return to work by October 17, 2023." (Pl. Opp. at 3.) The August 17, 2023 letter—or, for the sake of Plaintiff's argument, the September 18, 2023 letter—does not, on its face, threaten to terminate Plaintiff. As relevant here, the August 17, 2023 letter states two things: (1) Plaintiff was entitled to a cumulative one-year leave of absence from

his position due to his disability; and (2) if Plaintiff did not return to work after that one-year period, he could be terminated.  (Pl. Ex. 12 at 1–2.)  The September 18, 2023 letter states the same information, differing only by the correction of a typographical error.  (*Id*. at 3.)

As a matter of law, CSL § 71 "permits a civil service employer to terminate an employee who has been separated from service for more than one year by reason of disability resulting from an occupational injury."  *Santiago v. Newburgh Enlarged City Sch. Dist.*, 434 F. Supp. 2d 193, 195 (S.D.N.Y. 2006); *see also Yager v. Cnty. of Erie*, 2025 WL 219113, at *6 (W.D.N.Y. Jan. 16, 2025) ("As set forth in [plaintiff's] termination letter, the County ended her employment under Section 71 of the Civil Service Law because she had been absent for at least one year due to her disability resulting from an occupational injury or disease."); *Morris v. Town of Islip*, 2014 WL 4700227, at *15 (E.D.N.Y. Sept. 22, 2014) (termination pursuant to CSL § 71 "is a legitimate, non-discriminatory basis for the termination").  "No presumption of discrimination arises when an employer makes a decision explicitly provided for by the Civil Service Law."  *Bresloff–Hernandez v. Horn*, 2007 WL 2789500, at *6 (S.D.N.Y. Sept. 25, 2007) (citing *Syken v. New York*, 2006 WL 3771095, at *9 (S.D.N.Y. Dec. 21, 2006)).  Nonetheless, neither of the City's letters threaten to terminate Plaintiff.  Rather, the letters merely advise Plaintiff of his statutory entitlement to a leave of absence under CSL § 71 and the potential consequences under the statute if he failed to return to work after the permissible one-year period.  (Pl. Ex. 12 at 1–3.)  Moreover, while Plaintiff's opposition papers suggest that Defendant terminated him in May 2024, (Pl. Opp. at 24), the evidence demonstrates that Plaintiff remained on CSL § 71 leave and subsequently filed for retirement with the New York State Pension System in October 2024.[4]  (Def. Ex. C, Tr. 7:10–17, Ex G ¶ 4.)

_____

[4] Plaintiff also argues that the City asserted a "false claim in September 2023 that he had been out of work almost a year due to a disability."  (Pl. Opp. at 24.)  This argument appears to stem from a misunderstanding of the letters sent

Plaintiff's final argument that the City denying—or never responding to—his request for accommodation constitutes an adverse employment fares no better. An "alleged failure to accommodate [a plaintiff's] disability subsequent to an ADA… protected request cannot be bootstrapped into a viable disability retaliation claim." *Morris*, 2014 WL 4700227, at *18 (citing *Missick v. City of New York*, 707 F. Supp. 2d 336, 356–57 (E.D.N.Y. 2010)); *see also Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 457 (S.D.N.Y. 2023) (explaining that "a failure to provide a reasonable accommodation in and of itself does not equate to an adverse employment action"); *Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 90 (D. Conn. 2006) ("To the extent plaintiff claims that defendant's ongoing failure to accommodate her constituted retaliation, this claim is also insufficient as a matter of law. Requesting accommodation inevitably carries the possibility that the employer will not honor the request. If the prospect that an employer might not honor the request would deter a reasonable employee from even making the request, reasonable employees would not request accommodation. For this reason, a failure to accommodate cannot constitute retaliation for an employee's request for accommodation.").

Consequently, even viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that the City took adverse employment action against Plaintiff for requesting an accommodation. Given that Plaintiff cannot establish this element of an ADA retaliation claim, the Court need not reach the issue of causation and grants summary judgment to the City. The Court thereby grants Defendant's motion for summary judgment with respect to Plaintiff's ADA retaliation claims.

---

by the City. As the City explains, the August 17, 2023 letter—which is a more detailed version of the September 18, 2023 letter—states that Plaintiff had been on CSL § 71 leave for only 45 cumulative days between October 17, 2019 and August 3, 2023. (Def. Reply at 9.) The City was therefore notifying Plaintiff that his CSL § 71 leave "shall continue from August 4, 2023 (the date of the fitness-for-duty evaluation) onward." (*Id.*) The City did not state that Plaintiff's CSL § 71 leave re-commenced during the period of disciplinary suspension; rather, the leave resumed only after the suspension concluded. (*Id.*)

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.  The Court respectfully directs the Clerk of Court to enter judgment in favor of Defendant and close this case.

SO ORDERED.

Dated: January 29, 2026
        White Plains, NY

_____
Nelson S. Román, U.S.D.J.

22